**COUNTY OF OAKLAND, by George W. KUHN, the Oakland County Drain Commissioner, Plaintiff,**

and

**County of Macomb, by Thomas S. Welsh, the Macomb County Public Works Commissioner, Intervening Plaintiff,**

v.

**The CITY OF DETROIT, Coleman A. Young, Charles Beckham, Nancy Allevato, as Personal Representative for the Estate of Michael Ferrantino, Darralyn Bowers, Sam Cusenza, Joseph Valentini, Charles Carson, Walter Tomyn, Vista Disposal Inc., Michigan Disposal, Inc., Wayne Disposal, Inc., Wolverine Disposal, Inc., and Wolverine Disposal-Detroit, Inc., Defendants.**

Civ. A. No. 84–1068.

United States District Court,
E.D. Michigan, S.D.

Oct. 31, 1985.

Philip G. Tannian, Detroit, Mich., David R. Getto, Southfield, Mich., Robert H. Fredericks II, Pontiac, Mich., Brian P. Gettings, Arlington, Va., James I. Rubin, Chicago, Ill., for County of Oakland—plaintiff.

James A. Smith, Detroit, Mich., William W. Misterovich, Mt. Clemens, Mich., for County of Macomb—intervening plaintiff.

Edward F. Bell, Detroit, Mich., for City of Detroit.

Neil H. Fink, Detroit, Mich., for Samuel Cusenza.

S. Allen Early Jr., Detroit, Mich., for Coleman A. Young.

Richard E. Zuckerman, Troy, Mich., for Estate of Michael Ferrantino, Wayne Disposal & Charles Carsen.

Deborah J. Gaskin, Detroit, Mich., for Charles Beckham.

David F. DuMouchel, Detroit, Mich., for Joseph Valentini.

N.C. Deday LaRene, Detroit, Mich., for Darralyn Bowers.

Robert H. Harrison, Birmingham, Mich., for Michigan Disposal & Walter Tomyn.

## MEMORANDUM OPINION

SUHRHEINRICH, District Judge.

### Facts[1]

Oakland County enters into contracts with the City of Detroit and the Detroit Water and Sewerage Department (DWSD) for the transportation, treatment, and disposal of sewage. The work is performed by the Detroit Waste Water Treatment Plant (DWWTP). Detroit charges Oakland County according to the costs incurred by Detroit in providing the treatment and disposal service. Oakland County, in turn, collects revenues from its municipalities and pays Detroit.

The United States, in 1977, brought a civil action against Detroit and DWSD for violation of federal laws regulating discharge of pollutants. The parties entered into a consent judgment in which the defendants agreed to comply with the federal regulations by upgrading DWWTP. Mayor Young was appointed administrator of the DWWTP to speed up compliance.

Prior to 1979, sludge removed from sewage had been incinerated or discharged into the Detroit River. After 1979, because of the consent judgment, increasing amounts of sludge were required to be disposed of. As a result, Detroit entered into a contract with Michigan Disposal, owned by defendant Ferrantino, for hauling and disposal by landfill. As increasing amounts of sludge were needed to be disposed of, DWSD realized another contract would be necessary.

Michigan Disposal submitted an unsolicited proposal to increase its volume of disposal. DWSD rejected the proposal. Thereafter, Ferrantino and Michigan Disposal decided to establish a front company that would hide the interest of Ferrantino and Michigan Disposal to secure the second sludge disposal contract. Bowers, confidant of Young and Beckham, agreed to advance the scheme that was set forth. Ferrantino, Bowers, Tomyn, Cusenza, Valentini and Owens agreed to form the front company to be known as Vista Disposal Inc., which Owens would falsely hold himself out as owning.

On May 9, 1980, Vista submitted to Beckham its hauling and disposal proposal.

1. This section discusses the facts as *alleged* in the complaint. These are by no means findings of fact.

Bowers, using her influence as friend of Young and Beckham, tried to speed the consideration and grant the proposal. Young and Beckham agreed to grant the proposal. At the time they did so, they knew or should have known that Vista was a mere front company.

Beckham announced to David Fisher, an employee of DWSD, that he wanted the Vista proposal implemented. Fisher advised Beckham that Detroit was obligated to permit public bids on such contracts, and to award the contract to the lowest qualified bidder. Beckham rejected this procedure and instead merely requested Requests for Qualifications. DWSD, through Beckham, then notified Vista that it had been selected.

Carson, Vista's attorney, negotiated the terms of the contract with the City. Bypassing the City Council, Young, purportedly acting under his authority as Administrator of DWWTP, approved the contract. Thereafter, Bowers paid money to Beckham for his aid and influence. Vista then entered into a joint venture with Wolverine-Detroit to perform the contract.

Based upon the above allegations, plaintiffs brought three charges. Counts I and II charge violations of the Sherman Act. Counts III–VII charge violations of RICO. Last, Count VIII charges Coleman Young with Breach of Fiduciary Duty.

Motions to dismiss have been filed as to each Count. For the reasons stated below, the motions are granted.

### Antitrust Counts

Defendants have brought motions to dismiss plaintiffs' antitrust counts for several reasons. The threshold issue which must be addressed is that of standing. The action alleges in Counts I and II that defendants violated the Sherman Antitrust Act, 15 U.S.C. §§ 1–7 (1973), by fixing the price for disposal sludge, excluding competition for disposal sludge, and monopolizing the hauling and disposal of sludge. The Counties have not sued as *parens patriae* on behalf of their citizens because Congress has specifically delegated this power to the various State Attorney Generals. Rather, the Counties maintain that they, themselves, were injured by defendants' actions as direct purchasers.

Plaintiffs allege that they were injured in that the charges collected by Detroit for the treatment and disposal of their sewage have been unlawfully inflated as a result of defendants' antitrust violations. Defendants maintain that plaintiffs have suffered no injury because any inflated sums are collected from the individual municipalities, i.e., they are "passed on" to the customer. This "passing on" defense arises where a middleman sues the seller of a good or service for an antitrust violation. The defense provides that the middleman is not injured because it passes on any inflated prices to the consumer and the middleman has no standing as it has no loss. It is axiomatic that the Constitution requires that plaintiffs must allege an "injury in fact" to have standing to sue. *Linda R.S. v. Richard D.*, 410 U.S. 614, 617, 93 S.Ct. 1146, 1148, 35 L.Ed.2d 536 (1973). Further, standing requirements must be affirmatively pled in the complaint. *Sierra Club v. Morton*, 405 U.S. 727, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972).

The leading case on the "passing on" defense is *Hanover Shoe, Inc. v. United Shoe Machinery Corp.*, 392 U.S. 481, 88 S.Ct. 2224, 20 L.Ed.2d 1231 (1968). In *Hanover*, the court found that United Shoe had violated section 2 of the Sherman Act by virtue of its leasing of and refusing to sell certain shoe machinery which, in turn, caused inflated prices to Hanover Shoe. United Shoe attempted to assert the "passing on" defense against Hanover Shoe, alleging that Hanover merely passed on any inflated prices to its customers.

The court rejected the "passing on" defense in that case, noting that so long as Hanover Shoe paid more than it should, its profits were lower than they would have been without the illegal activity. Although the court in *Hanover* severely restricted the "passing on" defense, it did not abandon it. The court said:

We recognize that there might be situations—for instance, when an overcharged buyer has a pre-existing "cost-plus" contract, thus making it easy to prove that he has not been damaged—where the considerations requiring that the passing on defense not be permitted in this case would not be present. *Id.* at 494, 88 S.Ct. at 2232

Thus, the "passing on" defense, though limited, is still viable in certain situations.

The Sixth Circuit analyzed the "passing on" defense in *Obron v. Union Camp Corporation,* 477 F.2d 542 (6th Cir.1973). The court of appeals adopted Honorable Philip Pratt's memorandum opinion at 355 F.Supp. 902 (E.D.Mich.1972). In *Obron,* the defendant, Union Camp, manufactured mesh bags used by produce packagers. Obron, a distributor of these bags, would obtain an order from a customer and then submit it to Union Camp. The bags were sent directly from Union Camp to the customer. Union Camp would then bill Obron at 5% under list price and Obron would bill the customer at the list price. Obron sued Union Camp for Sherman Act violations arising out of the enforcement of an invalid patent.

In allowing the use of Union Camp's "pass on" defense, the district court said, "the crucial issue here is whether the circumstances of the case create a situation where it would be easy to prove that an overcharged buyer has not been damaged". 355 F.Supp. at 906. The court held that the contract was so strikingly similar to a pre-existing cost plus contract that the defense would be allowed. Obron, rather than being injured by defendant's actions, actually profited from them because it recovered, in effect, a sales commission percentage of the cost. Obron had no control over what price was charged customers. Thus, the reasoning of *Hanover,* that plaintiffs could have charged the inflated price without the higher cost and, thus, increased their profits, was inapplicable.

The issue in this case is whether the circumstances are such that proof that any overcharged buyers (i.e., the Counties)

have not been damaged is easy to prove. To determine this, an analysis of the contractual relationships involved is necessary. As discussed in paragraph 20 of Plaintiff Oakland County's Complaint:

Detroit charges Oakland County according to the cost incurred by Detroit in providing the treatment and disposal service. Oakland County, in turn, collects revenues from municipalities within each district and pays Detroit.

The same type of relationship is discussed in paragraph 20 of Macomb County's Complaint.

This relationship was described by the Sixth Circuit in *County of Oakland v. City of Berkley,* 742 F.2d 289 (6th Cir.1984). In that case, Oakland County, which was responsible for collecting charges from the municipalities that used the City of Detroit's sewage disposal system, brought suit against Berkley for declaration of amounts owed by it. In discussing the contract between the County of Oakland and the City of Detroit in which the City of Detroit agreed to receive and dispose of sanitary and storm sewage from the municipalities involved, the court held: "Oakland County served as an intermediary only, depending completely on payments from the municipalities to meet its obligation to Detroit". *Id.* at 292. Further, the court held that: "Since Oakland County is a *mere conduit* for sewer charges owed to the City of Detroit the failure of any of the municipalities ... to pay the charges allocated to them would *result in Detroit's receiving less money* for sewage disposal than was assumed and planned for...." *Id.* at 296 (emphasis added).

■ In applying the relationship of the parties to the law concerning the "passing on" defense, it becomes clear that the plaintiffs have not alleged the requisite damages to maintain standing in this matter. The Counties sustain no injury because they are only an intermediary. Thus, they derive no profit level which could be injured by the defendants' actions. In effect, the Counties are not really passing on inflated prices to the municipalities

because they are not buyers of the service. Rather, the allegedly inflated prices are aimed directly at the municipalities and the Counties merely collect the sums necessary to pay those charges. The Counties are, in a sense, mere collection agencies. The Court, therefore, holds that the Counties do not allege facts sufficient to meet the Constitutional standing requirement of an "injury in fact". There is nothing in the complaints indicating that they suffer an injury.

Further, from a theoretical standpoint, this is a perfect example of when the exception to the *Hanover Shoe* rule should be invoked.[2] The Court's reasons in *Hanover Shoe* for allowing a middleman to recover without deduction for "passing on" were the difficulties of the calculation of the overcharge to all the affected customers and the discouragement to· the ultimate consumer's suit where he is too little affected to sue. Neither of these problems is present here. Since the municipalities are charged directly for the services rendered, it is no more difficult to trace any overcharges if the consumers (the municipalities) sue than if the Counties sue. Further, if the allegations are true, the municipalities have been significantly affected; thus, there is sufficient incentive for them to sue.

Aside from this inquiry into whether or not there is Constitutional standing, there is a separate inquiry whether the plaintiffs have standing under section 4 of the Clayton Act. As the Supreme Court noted in *Associated General Contractors of California, Inc. v. California State Council of Carpenters*, 459 U.S. 519, 103 S.Ct. 897, 74 L.Ed.2d 723 (1983):

> Harm to the antitrust plaintiff is sufficient to satisfy the constitutional standing requirement of injury in fact, but the court must make a *further* determination whether the plaintiff is a proper party to bring a private antitrust action.

*Id.* 103 S.Ct. at 907 (emphasis added). So even assuming that plaintiffs had alleged sufficient "injury in fact" for constitutional purposes, and this Court holds that they have not, they would have only cleared the first hurdle. They would also need to show standing as a matter of antitrust law. As interpreted by the Sixth Circuit in *Southaven Land Co., Inc. v. Malone & Hyde, Inc.*, 715 F.2d 1079 (6th Cir.1983), the factors to be considered in determining antitrust standing are:

> (1) the causal connection between the antitrust violation and harm to the plaintiff and whether that harm was intended to be caused;
>
> (2) the nature of the plaintiff's alleged injury including the status of the plaintiff as consumer or competitor in the relevant market;
>
> (3) the directness or indirectness of the injury, and the related injury of whether the damages are speculative;
>
> (4) the potential for duplicative recovery or complex apportionment of damages; and
>
> (5) the existence of more direct victims of the alleged antitrust violation.

*Id.* at 1085. In *Southaven*, it was alleged that defendant Malone intentionally monopolized the food market industry in its local geographic area. When defendant became aware that plaintiff had a tenant prepared to immediately compete in the relevant grocery market, it refused to surrender the premises to Southaven. The Sixth Circuit, applying the factors outlined above, held that Southaven was not a proper antitrust plaintiff.

■ This Court, applying these factors to this case, finds the Counties are not the proper antitrust plaintiffs. The first three factors discuss the nature of a plaintiff's injuries. As discussed above, the Court holds that plaintiffs have alleged no injury whatsoever; therefore, the first three factors militate against a finding of standing. The fourth factor is whether there is

---

**2.** See E. Schaefer, *Passing-On Theory in Antitrust Treble Damage Actions: An Economic and Legal Analysis,* 16 Wm. & Mary L.Rev. 883

(1975); R. Harris & L. Sullivan, *Passing on the Monopoly Overcharge; a Comprehensive Policy Analysis,* 128 U.Pa.L.Rev. 269 (1979).

the potential for duplicative recovery. Without needing to decide, the Court notes that the municipalities involved, the citizens of the Counties, and competitor sludge disposal companies might be able to recover for the alleged antitrust violations. Thus, the potential exists. Last, as to the fifth factor, the municipalities, which pay the allegedly inflated amounts which the Counties merely collect, are the direct victims of the alleged violation. The cost is charged directly to them and the Counties merely collect the sums. Application of the *Southaven* factors, then, further supports this Court's finding of a lack of standing on behalf of the Counties.

### *RICO Counts*

 RICO provides remedies to anyone "injured in his business or property by reason of a violation of section 1962". 18 U.S.C. § 1964(c). For the reasons stated above, the Court holds that plaintiffs do not have standing to sue. They have not been injured by any of the defendants' alleged activities. As held in *County of Oakland v. City of Berkley*, 742 F.2d 289 (6th Cir.1984), "[s]ince Oakland County is a mere conduit for sewer charges owed to the City of Detroit the failure of any of the municipalities ... to pay the charges allocated to them would result in Detroit's receiving less money for sewage disposal than was assumed and planned for". *Id.* at 296. Thus, it is the municipalities who are injured by the inflated prices and, if they do not pay the higher prices, then the City of Detroit takes the loss. Thus, the Counties are acting solely as collectors of these sums and are not injured.

### *Breach of Fiduciary Duty*

Plaintiffs have sued Coleman A. Young for breach of his fiduciary duty as court-appointed Administrator of the DWWTP. Again, plaintiffs allege in paragraph 92 of their respective complaints that their injuries are the unconscionably inflated prices paid for the treatment and disposal of sewage. For the reasons set forth above, the Court holds that the Counties are not injured and, therefore, plaintiffs' counts for breach of fiduciary duty should be dismissed.

An appropriate order will be entered.